**ST. LUKE'S HOSPITAL OF KANSAS CITY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 77–0679–CV–W–5.

United States District Court, W. D. Missouri, W. D.

May 22, 1980.

D. Brook Bartlett, Dennis P. Wilbert, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for plaintiff.

J. E. Crowe, Jr., Trial Atty. for Tax Division, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER ENTERING JUDGMENT IN FAVOR OF PLAINTIFF

SCOTT O. WRIGHT, District Judge.

This is a civil action brought by St. Luke's Hospital of Kansas City against the United States of America for the recovery of internal revenue taxes alleged to have been erroneously collected. Defendant contends that the taxes were correctly owed by plaintiff because the taxed income is unrelated to any of plaintiff's exempt functions. Trial was held before the Court on these issues, and for the reasons stated below judgment is entered in favor of plaintiff.

## FINDINGS OF FACT

1. St. Luke's Hospital of Kansas City (hereinafter St. Luke's) is an exempt organization pursuant to Section 501(c)(3) of the Internal Revenue Code of 1954, as amended. Charitable contributions to St. Luke's are deductible for federal income tax purposes pursuant to Section 170(c)(2) of the Internal Revenue Code of 1954, as amended.

2. St. Luke's Articles of Agreement, as they were in effect during the years in suit, stated in part the following purposes for which it was organized as a not-for-profit corporation:

"[T]o own, operate and conduct a charity and pay hospital, a school of teaching the vocation of nursing, the training and educating of medical students, interns, residents and physicians, and in general conducting the various aspects of a medical education program, an asylum for the care, education and maintenance of orphans and indigent persons, and also other enterprises of a benevolent and charitable nature; to furnish medical and surgical aid to such persons as may, under regulations prescribed by the Board of Directors of this corporation, become attendants at said school, or patients or inmates of said hospital, asylum or any other benevolent and charitable enterprise conducted by said corporation. . . ."

3. In accordance with the purposes stated in the Amended Articles of Agreement, St. Luke's maintains a hospital located at Wornall Road at 44th Street, Kansas City, Missouri. During the years in suit, the Hospital employed approximately 1,500 to 1,700 persons and had approximately 500 to 650 beds. The Hospital's facilities include those commonly found in hospitals offering general medical care, including a Pathology Department.

4. The Pathology Department performs a wide range of tests essential to the diagnosis and treatment of patients of the Hospital. At the request of certain doctors of its medical Staff, St. Luke's Pathology Department performs what are termed "outside pathology tests." These tests are primarily Cytology tests (Papanicolau smears, hereinafter "Pap smears"). In addition, some tests on tissue specimens are included in the term "outside pathology test." The Hospital's Pathology Department obtains the vast majority of specimens for these tests from staff physicians who have their

offices directly across the street from St. Luke's in the Wornall Medical Plaza Building, 4320 Wornall Road, Kansas City, Missouri.

5. The procedure followed during 1971, 1972, and 1973 with respect to the outside pathology tests was as follows: The smear or tissue sample was obtained from the patient in the medical staff physician's office; the smear or tissue sample was then placed on a slide and immersed in a preservative provided by the Pathology Department of St. Luke's; an employee of St. Luke's picked up the slides and delivered them to the Pathology Department for testing and interpretation; the results were transmitted to the medical staff physician; the Pathology Department maintained a record of each test and the patient was billed directly by St. Luke's.

6. At least 90% of the outside pathology tests performed in 1971, 1972, and 1973 were performed for physicians on the medical staff of St. Luke's. In addition, at least 95% of the physicians utilizing the outside pathology test service were on the medical staff of St. Luke's and maintained offices in the Wornall Medical Plaza Building directly across the street from St. Luke's.

7. On or about March 15, 1972, St. Luke's Hospital filed Form 990–T with the Internal Revenue Service Center at Philadelphia, Pennsylvania for the calendar year 1971 and reported unrelated taxable income of $25,608 and a tax due on this income of $5,791.84. The unrelated business income tax reported due for the calendar year 1971 has been paid in full or otherwise credited.

8. On or about March 15, 1973, St. Luke's filed Form 990–T with the Internal Revenue Service Center at Philadelphia, Pennsylvania for the calendar year 1972 and reported unrelated taxable income of $35,435 with a tax due on this income of $10,028.80. The unrelated business income tax for the calendar year 1972 has been paid in full by St. Luke's.

9. On or about March 14, 1974, St. Luke's filed Form 990–T with the Internal Revenue Service Center at Philadelphia, Pennsylvania for the calendar year 1973

and reported unrelated taxable income of $32,074 and a tax due on this income of $8,895.52. The unrelated business income tax reported due for the calendar year 1973 was paid in full by St. Luke's Hospital.

10. St. Luke's filed with the District Director of the Internal Revenue Service Center, Philadelphia, Pennsylvania, the following claims for refund:

(a) For the calendar year 1971 in the amount of $5,791.84;

(b) For the calendar year 1972 in the amount of $10,028.80;

(c) For the calendar year 1973 in the amount of $8,895.52.

11. On or about December 10, 1975, the District Director notified St. Luke's by letter of his proposed denial of the claims for refund.

12. On February 12, 1976, St. Luke's filed its protest with the District Director with respect to the denial by the District Director of its claims for refund for calendar years 1971, 1972 and 1973.

13. On August 12, 1976, St. Luke's executed and filed Form 2297, Waiver of Statutory Notification of Claim Disallowance, showing that the amounts disallowed of the refunds claimed were $5,791.84 for 1971, $9,387.64 for 1972, and $8,432.86 for 1973.

14. On October 4, 1976, the appellate conferee issued his report disallowing St. Luke's protest and affirming the denial of the claims for refund in the amounts stated in the preceding paragraph.

15. The performance and interpretation of outside pathology tests by the pathology department of St. Luke's Hospital is substantially related to the performance of the purposes or functions constituting the basis for St. Luke's exemption under Section 501 because these tests contribute importantly to the teaching functions of the hospital.

16. St. Luke's trains interns and residents in specialty fields of pathology and obstetrics and gynecology. Medical students, medical technologists and nurses are also trained at St. Luke's. The outside pathology tests provided an additional sup-

ply of Pap smears and tissue tests needed for teaching residents, interns, medical students, medical technologists and nurses.

17. The outside pathology test program produced a high volume of Pap smears for analysis—1971, 14,350; 1972, 14,384; and 1973, 14,512. The number of Pap smears resulting from the Hospital's internal operations for the years in suit were approximately as follows: for 1971, 1,123; for 1972, 1,083; and for 1973, 1,092.

18. In addition, St. Luke's Hospital Foundation for Medical Education and Research provided funds for certain clinics in the Kansas City area to provide free Pap smears. These Pap smears were sent to the Pathology Department at St. Luke's for testing and interpretation. No charge was made by St. Luke's for these tests which numbered between 18,000 and 20,000 in each of the years 1971, 1972 and 1973.

19. In addition, the tissue test portion of the outside pathology test program numbered approximately 2,365 in 1971, 1,515 in 1972 and 2,302 in 1973. The number of tissue tests resulting from the Hospital's internal operations totalled approximately 6,223 in 1971; 7,192 in 1972; and 7,736 in 1973.

20. Only a small percentage of these tests are positive, and the positive tests provide the most beneficial teaching experiences in the interpretation and diagnosis of these tests, and, therefore, it is necessary to have a large number of tests in order to have sufficient positive tests for teaching purposes.

21. One part of the teaching program is in pathology. Pathology focuses generally on the study of abnormal tissues. During the years 1971, 1972 and 1973, St. Luke's had approximately 15 to 20 residents and interns who were in the teaching program conducted in the Pathology Department. Part of their education in the Pathology Department involved the interpretation of Pap smears and tissue tests.

22. Another aspect of St. Luke's teaching program is training residents and interns in Obstetrics and Gynecology. The abnormal test results are also discussed in weekly conferences with interns and residents in Obstetrics and Gynecology. That the more slides they have to use in these conferences, the better it is for teaching purposes.

23. The additional outside pathology tests contribute importantly and substantially to St. Luke's teaching program.

24. In September, 1975, John J. Holland, Assistant Comptroller for St. Luke's Hospital, met with an IRS agent to discuss the terms of an IRS audit. One of the items challenged by the IRS was a medical education expense allocated to the income from the outside pathology tests. This conference took place before any ruling had been made on St. Luke's claim for refund.

25. St. Luke's at this time contended that medical education was an important cost allocation to the income derived from the outside pathology tests. The IRS accepted the medical education expense allocated to the income from the outside pathology tests, recognizing that the outside pathology tests contributed to the medical education function of St. Luke's Hospital.

26. Not only did the outside pathology tests contribute importantly to the teaching functions of St. Luke's, they are also performed at the request and primarily for the convenience of doctors on the staff at the hospital. Ninety per cent of the outside tests are performed for members of the hospital staff who have their offices directly across the street from the hospital.

27. The performance of this service by St. Luke's was convenient for these members for two reasons: first, it is convenient because in the event of a positive test, surgery would be performed at St. Luke's and it is desirable to have the same pathologist who interpreted the test interpret the biopsy. It is also easier to confer with the pathologist about a positive test because the doctors are frequently at St. Luke's attending their patients. Secondly, it is convenient because of the doctors' implicit confidence in the quality of the work performed by the pathology department of St. Luke's.

## CONCLUSIONS OF LAW

1. Pursuant to the provisions of 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422(a), this Court has jurisdiction of this civil action against the United States for the recovery of internal revenue taxes alleged to have been erroneously or illegally collected.

■ 2. The outside pathology tests performed and interpreted by the Pathology Department of St. Luke's Hospital substantially relate to the performance by St. Luke's Hospital of the exempt purposes or functions constituting the basis of the hospital's exemption under Section 501, Internal Revenue Code of 1954, as amended, and, therefore, are not an "unrelated trade or business," as that term is defined in Section 513(a), Internal Revenue Code of 1954, as amended.

3. The performance and interpretation of outside pathology tests by the Pathology Department of St. Luke's Hospital are primarily for the convenience of certain physicians on the staff of St. Luke's Hospital who are "members" of the hospital for the purposes of Section 513(a), Internal Revenue Code of 1954, as amended.

4. Therefore, internal revenue taxes collected by defendant from St. Luke's Hospital of Kansas City for the years 1971, 1972 and 1973 in the amounts of $5,791.84, $9,387.64 and $8,432.86, respectively, were unlawfully and erroneously collected by defendant.

5. St. Luke's Hospital is entitled to a refund of internal revenue taxes in the amounts of $5,791.84, $9,387.64 and $8,432.86 plus interest as provided in 28 U.S.C. § 2411(a).

## OPINION

This case arises under Section 501 of the Code, the tax exemption granting provision, and Sections 511–513, the primary unrelated business income tax provision of the Code. Section 501(a) provides in relevant part that "[a]n organization described in subsection (c) . . . shall be exempt from taxation under this subtitle. . . ." St. Luke's is an organization described in Section 501(c)(3).

■ Statutory provisions which grant tax exemptions to organizations designed to benefit the public good through charitable, religious, scientific, or educational purposes are construed liberally against taxation. This rule of construction is based upon the policy that the benefit derived from the revenue is outweighed by the benefit derived by the public from the services of these organizations. *Helvering v. Bliss*, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246 (1934); *C. F. Mueller Co. v. Commissioner of Internal Revenue*, 190 F.2d 120 (3rd Cir. 1951); *Harrison v. Barker Annuity Fund*, 90 F.2d 286 (7th Cir. 1937); *United Hospital Services, Inc. v. United States*, 384 F.Supp. 776 (S.D. Ind.1974).

Section 501(b) provides in relevant part that "[a]n organization exempt from taxation under subsection (a) shall be subject to tax to the extent provided in parts II, III, and VI of this subchapter . . . ." Part II of the subchapter referred to in Section 501(b) is entitled "Taxation of Business Income of Certain Exempt Organizations" and consists of Sections 511–515 of the Code. At issue in this case are Sections 511–513.

■ Section 511 imposes a tax on the "unrelated business taxable income" of certain otherwise tax-exempt organizations. Section 512 defines the tax base of unrelated business taxable income. Section 513 defines the term unrelated trade or business.

Generally, for an activity to be taxable under Sections 511–513, it must

(1) constitute a trade or business;

(2) be regularly carried on;

(3) be unrelated to the exempt purpose of the organization engaging in the activity;

(4) not be done for the convenience of the organization's members, students, patients, officers or employees.

If any of these four elements is not present, the activity cannot be taxed. The evidence at trial shows that neither the third nor the fourth element is present.

The primary issue in this case is whether the outside pathology tests are unrelated to St. Luke's exempt purposes. The standard for making this determination is set forth in the Income Tax Regulation (hereinafter "Reg.") Section 1.513–1(d)(2). This provision requires an inquiry into whether the outside pathology tests in question contribute importantly to the accomplishment of St. Luke's exempt purposes.

The defendant argues that the performance of the outside pathology tests do not contribute importantly to St. Luke's exempt functions and relies primarily upon *Carle Foundation v. United States*, 611 F.2d 1192 (7th Cir. 1979). However, *Carle* is easily distinguished from this case. *Carle* involved the sale of drugs by a hospital pharmacy to people other than hospital patients. This activity could not be classified as contributing to the educational function of a hospital. As discussed below, this Court finds that the activity here in question clearly contributes to the teaching function of St. Luke's and, therefore, *Carle* is not controlling authority.

One of St. Luke's exempt purposes, as stated in its Amended Articles of Agreement, is "the training and educating of medical students, interns, residents and physicians, and in general conducting various aspects of a medical education program. . . . ."

One part of the teaching program is in pathology, the study of abnormal tissues. During the years 1971, 1972 and 1973, St. Luke's had approximately 15 to 20 residents and interns who were in the teaching program conducted in the Pathology Department. Part of their education in the Pathology Department involved the interpretation of Pap smears and tissue tests.

Another aspect of the teaching program is conducted in the Department of Obstetrics and Gynecology. Weekly conferences are held with Obstetrics and Gynecology residents and interns for the purposes of discussing abnormal Pap smears.

Only a very small percentage of Pap smears and tissue tests, about 4%, are positive. Within this positive group there are many gradations of abnormal, and only a small percentage is cancer. Therefore, a large volume of Pap smears and tissue tests is essential for a high quality medical education program in Pathology or Obstetrics and Gynecology.

Consequently, the more tests that are run the greater the opportunity of producing a wide range of abnormal slides for physicians, interns, and residents to study and interpret. There can never be too many tests, because the more there are the richer the available instructional material is and the better the teaching program is. The outside pathology test program produced a high volume of Pap smears for analysis. Therefore, the outside pathology tests contribute importantly to the hospital's medical education program, and as a result, the outside pathology tests are substantially related to St. Luke's exempt purpose of providing medical education.

The court in *Anateus Lineal 1948, Inc. v. United States*, 366 F.Supp. 118 (W.D.Ark. 1973), considered whether pathology tests performed by an exempt organization constituted an unrelated trade or business. In that case the exempt organization provided pathology testing for area hospitals and physicians. The primary activities of the exempt organization were research and the teaching and training of people in the medical profession. The United States contended that the pathology service provided by the exempt organization did not constitute fundamental research or further the exempt purposes of the exempt organization. The court found that the performance of the tests were substantially related to the exempt purposes of the organization and stated that

"Medical education and research are unique in that persons involved in such pursuits must ultimately have human specimens with which to work. Much of the research and training given by plaintiff is aimed at learning and teaching diagnostic techniques, and in order to do this, human tissue and specimens must be available with which to perform research and to carry on the teaching." 366 F.Supp. at 127.

The court concluded that "[t]here is no way to properly train medical technicians other than having them observe [and] work with the problems they are to see in actual practice." 366 F.Supp. at 127. Similarly, St. Luke's is a teaching hospital. In order to effectively carry out its teaching activity in the highest professional manner, St. Luke's must have a large number of specimens which the outside pathology tests help provide. The outside pathology tests contribute importantly to the teaching function of the hospital and are substantially related to one of its exempt purposes.

Moreover, the relatively small size of the outside pathology test program indicates the non-commercial nature of the activity. Section 1.513–1(d)(3) of the Regulations provides that "[i]n determining whether activities contribute importantly to the accomplishment of an exempt purpose, the size and extent of the activities involved must be considered in relation to the nature and extent of the exempt function which they purport to serve." The outside pathology tests generated .035 of the total revenue in the Pathology Department in 1971, .028 in 1972, and .026 in 1973. When compared to total hospital revenue, the insignificance of the outside pathology test revenue is even more striking. The outside pathology tests generated .0053 of the total hospital revenues in 1971, .0043 in 1972, and .0042 in 1973. This is not substantial revenue or profit which indicates a commercial enterprise.

Furthermore, St. Luke's has never solicited or encouraged staff physicians to utilize the service. The program is not advertised in any way. The absence of solicitation and advertising substantiate the essentially non-commercial operation of the outside pathology test program.

The defendant maintains that the medical education argument should be barred from the case by the "variance" rule because this ground for recovery was not spelled out in St. Luke's claim for refund. *See Godwin v. Brown*, 249 F.2d 356, 363 (8th Cir. 1957); *Laurel Hill Cemetery Ass'n v. United States*, 427 F.Supp. 679, 683–84 (E.D.Mo.1977), *aff'd*, 566 F.2d 630.

The variance rule to which the defendant refers is the jurisdictional prerequisite to suit as set forth in the Internal Revenue Code and the Treasury Regulations. Title 26 § 7422(a) provides that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with the Secretary. . . ." Additionally, Section 301.6402–2(b), Treasury Regulation on Procedure and Administration (1954 Code), requires that "[t]he claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof."

St. Luke's claims for refund for each of the three years are identical. Each sets out the specific Code sections relied on by plaintiff, and each ends with a summary of St. Luke's position which states:

"The taxpayer contends . . . that the pathology lab tests performed for these doctors, many of whom are members of the hospital's medical staff, constitute a substantially related trade or business not subject to taxation under Section 511(a) of the Internal Revenue Code." (Plaintiff's Exhibits 2, 4, and 6).

This is precisely the ground plaintiff is now relying upon.[1] To support this contention in its claim for refund, plaintiff stated that the pathology lab tests "contribute importantly to the hospital's functions of providing the utmost in medical treatment and services to the community." *Id.* One way a teaching hospital provides the utmost in medical treatment and services to the community is in training competent physicians. Furthermore, in plaintiff's supplemental

---

1. See *Santa Cruz Building Ass'n v. United States*, 411 F.Supp. 871 (E.D.Mo.1976) (merely stating sections of the Code on which taxpayer relies is sufficient); *Walker v. United States*, 143 F.Supp. 566 (N.D.Tex.1956) (merely stating that collection of penalty is unconstitutional is sufficient).

brief to its Protest against the Revenue Agent's Report, the plaintiff stated:

"The hospital can establish that the performance of these outside tests does . . . (4) make more effective use of hospital facilities for training purposes." (Plaintiff's Exhibit 7).

This Court finds no inconsistency or "variance" between the arguments presented by St. Luke's in its claim for refund and the arguments presented before this Court, particularly in light of defendant's own actions during the relevant time period.

In 1975 the IRS allowed St. Luke's to allocate medical education expenses to the income generated by the outside pathology tests for the years in question. Now the government contends that St. Luke's cannot raise the issue here because they did not assert it in their claim for refund. The IRS recognized then that the outside pathology tests contribute to the teaching function of the hospital, and to apply the variance rule under these circumstances now would lead to an incongruous and unjust result. *See Santa Cruz Building Ass'n v. United States,* 411 F.Supp. 871 (E.D.Mo.1976). For the reasons stated above, the Court finds that evidence relating to the teaching function of the hospital was properly admitted and that it is a proper ground for finding in favor of the plaintiff in this case.

But even if the variance rule was applied, the Court would be compelled to reach the same result. Section 513(a)(2) excludes from the unrelated trade or business income tax any activity carried on primarily for the convenience of its members. The evidence shows that performance of the outside pathology tests by St. Luke's is primarily for the convenience of members on its staff. At the request of the doctor, the hospital picks up the test at the doctor's office and brings it to the Pathology Department. If the test result indicates surgery, the patient will most likely be hospitalized at St. Luke's, and the hospital pathologist is available to consult with the doctor at a place where the doctor spends a substantial portion of his day. The slides are readily available to the doctor so that he can examine them himself and also compare the test results with later biopsy tests done at the Pathology Department. If the patient's records show that prior tests were conducted on that patient, these prior test results may be easily consulted for comparison with the current test.

Knowing that the tests will be conducted properly is another convenience to these doctors. Even the defendant's own witness admitted to the high quality of the work done at St. Luke's. One of the plaintiff's witnesses testified that if St. Luke's did not perform these tests, he would do so himself to insure quality control, and this would be an inconvenience to his practice. The Court finds from the evidence that the outside pathology tests were performed primarily for the convenience of the members of St. Luke's medical staff.

The defendant argues that the doctors for whom these tests are performed are not "members" of St. Luke's Hospital. The members of the medical staff of St. Luke's are physicians who have the privilege of admitting patients to the hospital and practicing at the hospital, but they are not employed by the hospital. The Board of Directors of St. Luke's appoints members of the medical staff, but the medical staff is a separate entity from the hospital. Neither St. Luke's nor the medical staff organization have the power to exercise control over any of the activities of the medical staff physicians in their private practices. The by-laws of St. Luke's provide for active and honorary members and neither category includes medical staff physicians. For these reasons, the defendant contends that the physicians who make use of the outside pathology tests are not "members" of the hospital.

The plaintiff argues that the defendant's definition of members is too restrictive, and the Court agrees. The Court prefers the definition of members as suggested by St. Luke's. "Members" refers to any group of persons limited in size who are closely associated with the entity involved and who are necessary to the achievement of the organization's purposes. The doctors

on the hospital staff precisely fit this broader definition of members because they are indispensable to the operation of the hospital. In order to operate as a hospital, St. Luke's needs patients. A private hospital's primary source of patients is through the doctors on its medical staff. To contend that the doctors in this indispensable group are not members of the hospital is to ignore the substance of the group's relationship with the exempt organization.

Moreover, giving members a broader meaning than the excessively literal meaning advocated by defendant is consistent with the legislative purpose underlying the unrelated business provisions and consistent with the rule requiring a liberal interpretation of statutory provisions which favor tax exemption. By permitting exempt organizations to furnish services to people closely associated with the achievement of its goals, the exempt purposes of the organization are directly furthered and the comparative effects of the activity restricted. Here the outside pathology tests were limited to staff doctors and were not made available to all physicians in the community. The Court finds that for the purposes of Section 513(a)(2) the doctors of St. Luke's medical staff are members of the hospital within the meaning of this section.

Defendant also contends that even if these doctors are members of St. Luke's the performance of the outside pathology tests are not " 'primarily' necessary 'for the convenience' of staff physicians." (Defendant's trial brief, page 20). To support this contention defendant's entire case revolved around the testimony of one witness, Dr. Wheeler, the owner of Wheeler Medical Laboratories, a pathology laboratory located across the street from St. Luke's Hospital. Defendant's theory was that it would have been just as convenient for these physicians to send their pathology tests to Wheeler Medical Laboratories as it would have been for them to send the tests to St. Luke's Hospital. Defendant misconstrues the meaning of this section. The plaintiff need only prove that the service performed at a pathology department is *primarily* for the convenience of its members—not that it is *primarily necessary* for the convenience

of its members. Plaintiff is not required to show that there were no other alternatives available to the members of its staff.

Even so, defendant fails to show by its evidence that there was a reasonable alternative in Wheeler Medical Laboratories. During the time period in question, Dr. Wheeler was Mayor of Kansas City, Missouri, and admitted that a physician would have had difficulty in reaching him to discuss test results. Dr. Wheeler was associated with another pathologist, but this pathologist had his offices in Independence, Missouri and was not located in Wheeler's laboratory. In addition, Wheeler's Medical Laboratory performed the Pap smear test but not the tissue test. Under this set of facts, it would be inconceivable to find that use of Wheeler Medical Laboratories would have been as convenient for these physicians.

In conclusion, this Court finds that the income derived from the outside pathology tests contribute importantly to one of St. Luke's exempt purposes and the income is not taxable as unrelated business income. Accordingly, it is hereby

ORDERED that the United States refund to St. Luke's internal revenue taxes in the amounts of $5,791.84, $9,387.64 and $8,432.86 plus interest as provided in 28 U.S.C. § 2411(a). The parties will bear their own costs.